United States District Court
Western District of Wisconsin

Kevin Sierra-Lopez,
    Plaintiff,

V.                        Case No.: 17-cv-599-wmc

Michael Lamarca, Nurse Larb,
Capt. Miller, Denise Valerious,
Mary Mashak, Michael Dittman,
Dr. Syed, Jolinda Waterman,
Nurse R. Feldman, and Dr. S. M°Ardle,
    Defendants.

## CIVIL COMPLAINT
## PURSUANT TO 42 U.S.C. §1983

    Plaintiff, Kevin Sierra-Lopez, as a cause of action against the above named defendants, hereby pleads the following:

### Nature of the Case

    (1) This is a civil rights complaint brought forth pursuant to 42 U.S.C. §1983 for violation of plaintiff's 8th Amendment Right under the U.S. Constitution and, furthermore, for defendants engaging in state law medical malpractice/negligence against plaintiff, for which he seeks declaratory, injunctive and monetary relief.

## Jurisdiction

(2) The Court has original jurisdiction over this action under 28 U.S.C. §1331(a), and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

## Venue

(3) The Court has venue of this action under 28 U.S.C. §1391(b).

## Exhaustion

(4) Plaintiff has exhausted all available administrative remedies.

## Parties

(5) Plaintiff, KEVIN SIERRA-LOPEZ, was at all relevant times a prisoner confined within the Wisconsin Department of Corrections (DOC), at Columbia Correctional Institution (CCI), P.O. Box 900, Portage, WI. 53901-0900 (from 3-8-16 to 10-21-16), and at Wisconsin Secure Program Facility (WSPF), P.O. Box 9900, Boscobel, WI. 53805-9900 (from 10-21-16 to present).

(6) The defendants, at all relevant times, were (or still are) as follows: Michael Lamarca, the dentist at CCI; Nurse Barb[1] a Nurse at CCI; Capt. Miller, a security supervisor at CCI; Denise Valerious, a Nurse at CCI; Mary Mashak, Health Services Unit (HSU) Manager (HSM) at CCI; Michael Dittman, the Warden at CCI; Dr. Syed, the medical doctor at CCI; Jolinda Waterman, the HSM at WSPF; Nurse R. Feldman, a Nurse at WSPF; and Dr. S. McArdle, the medical doctor at WSPF.

(6)(A) All defendants acted under color of state law and are being being sued in their individual capacity.

## Facts

(7) On 3-8-16, defendant Lamarca extracted the two wisdom teeth (upper and lower) from plaintiff's left dental plate. This was done in the A.M., approximately 10:00 A.M..

(8) A piece of tooth was left in plaintiff's mouth following the dental surgery, supra (7), which was not removed until more than a half of a year later on 9-27-16.

---

[1] The correct spelling and complete names of most of the defendants are currently unknown to plaintiff, and will have to be determined after the pleadings.

(9) On 3-8-16, following the dental surgery, supra (7), plaintiff was in excruciating pain, but was not provided any pain medication for nearly 12 hours.

(10) Plaintiff had a cellmate named Eric McDonald at the time, supra (9), and he took hold of the cell-door trap (i.e., an open slot through which food trays and other items are passed through the door by staff, but is otherwise kept closed, locked and secured) and refused to allow it to be closed until plaintiff received medical attention.

(11) As a result of McDonald's actions, supra (10), he was removed from the cell with plaintiff (i.e., cell B-#48, lower range, of Restrictive Housing (R.H.) #2) and placed in a cell on R.H. #1; although, his actions resulted in plaintiff receiving medical attention and some pain medication (generic "Acetaminophen") at approximately 9:15 p.m. on 3-8-16.

(12) The acetaminophen did not relieve plaintiff of the excruciating pain he was experiencing. Moreover, he was unaware that he still had a piece of tooth left in his gum following the dental surgery.

(13) On 3-9-16, plaintiff received a new cellmate named Douglas Nicely.

(14) On 3-9-16, plaintiff repeatedly complained to CCI staff that he was in extreme pain due to the dental surgery and needed pain re-

-lief/medication sufficient enough to control it because the acetaminophen was not.

(15) One of the persons plaintiff complained to on 3-9-16, supra (14), was defendant Nurse Barb, and her response was "put in a blue slip" (i.e., a "Health Service Request" (HSR) form); but, she refused to examine him, provide additional pain medication, or have him seen by other HSU staff capable of doing so.

(16) On 3-9-16, plaintiff did submit an HSR to CCI's Health Service Unit (HSU), explaining that the acetaminophen was ineffective in treating his dental pain, that he needed stronger pain relief medication because the pain was unbearable, he had difficulty opening his mouth, eating, drinking, sleeping, and he was having spells of dizziness. However, he did not receive any additional pain medication, examination or treatment.

(17) On 3-10-16, plaintiff saw PSU (Psychological Services Unit) staff Dr. Trinidad, a mental health doctor, but no dental or medical doctor.

(18) On 3-10-16, during the visit with Dr. Trinidad, supra (17), plaintiff told him all that he was going through, supra (16), that he had wrote HSU dental department to no avail, and Dr. Trinidad said he too would notify HSU. This visit occurred at approximately 9:45 a.m..

(19) On 3-10-16, at approximately 6:30 p.m., plaintiff was taken out of the cell to use the phone, saw a Lieutenant at the Sgt.'s desk and

-5-

notified him of what he was going through dentally as well, supra (16), and he too said he would notify HSU.

(20) On 3-10-16, at approximately 11:30 p.m., plaintiff could no longer bear the pain dentally, mentally, emotionally, could not sleep, and had a psychological breakdown.

(21) During that time, supra (20), the dental pain he was enduring was so great that plaintiff began to engage in self-harm and disfigurement, partly in hope to receive medical treatment that would relieve his pain from both the self-harm and disfigurement, as well as dental surgery, and partly due to him simply being no longer capable of coping psychologically.

(22) The self-harm and disfigurement plaintiff engaged in was: (i) he cut a gash into his right forearm 3 to 4 inches long and approximately 2 inches wide, to the veins, and began to bleed profusely; and (ii) he stuck a piece of a paper-clip, about 3 to 4 inches in length into his penis (through the penile opening) and then further forced a pen insert into his penis, causing blood to come from his penis as well.

(23) After initially cutting himself, supra (22)(i), plaintiff's cellmate awoke and started kicking the cell door (after initially attempting to stop plaintiff and failing) to alert CCI staff. Correctional Officer (C.O.) Xiong appeared at the cellfront shortly thereafter (approx-

-imately 5 mins.), and Nicely told him that plaintiff was trying to commit suicide.

(24) After seeing plaintiff bleeding from the arm C.O. Xiong left immediately and, approximately 10 minutes later, came back and ordered plaintiff to hand out the metal paper-clip, but he refused; and, that is is when plaintiff began to insert it and the pen insert, supra (22)(ii), into his penis, right in front of C.O. Xiong, and began to bleed from his penis.

(25) At approximately 12:15 a.m., then 3-11-16, Capt. Miller arrived at plaintiff's cell front, along with several other C.O.s, and had plaintiff removed from the cell and taken to the R.H.#1 disciplinary hearing room/booth, and took photos of plaintiff's wounds.

(26) Defendant Capt. Miller did not take plaintiff to HSU, arrange for off-site medical attention, nor take plaintiff to any medical staff to receive treatment.

(27) Approximately 5 minutes after taking the photos, supra (25), and leaving, defendant Miller returned to tell plaintiff that HSU staff was contacted and told him they will be in tomorrow after 6:00 a.m. (i.e., 6:00 a.m., 3-11-16), and that plaintiff would have to wait until then to receive medical treatment.

(28) Defendant Miller thereafter, supra (27), placed plaintiff in

-7-

control status, and a control/observation status cell — one in which he's not allowed pens, writing paper, or most other property, including institution forms (such as HSR forms).

(29) Prior to being placed in control status plaintiff showed defendant Miller that he was still bleeding from his penis; and, although the blood from plaintiff's arm had began to dry some (in part due to him using his sheet to stop the bleeding prior to being escorted from the cell, supra (25)) it remained an open wound.

(30) At that time, supra (25)-(29), plaintiff needed medical attention, and to be examined by medical staff.

(31) At that time, supra (25)-(29), plaintiff needed stitches for his arm and the items removed from his penis.

(32) Plaintiff remained in excruciating pain and repeatedly requested medical attention from the CCI staff that did "rounds" (i.e., regular security checks of each cell and prisoner, each hour and several times during the hour when a prisoner is in "control" status, as plaintiff was) throughout the night (early A.M.) of 3-11-16, to early dawn.

(33) On 3-11-16, meals were passed out at approximately 6:45 A.M. (breakfast) and approximately 11:30 A.M. (lunch), and between those times plaintiff repeatedly requested medical assistance from the CCI staff that came through the hallway, including defendant Denise Val-

-8-

-serious.

(34) On 3-11-16, at approximately 7:30 a.m., defendant Valerious came in the hallway to pass out medication to another prisoner just a couple of cells down from plaintiff, during which plaintiff relayed to her that he had an open wound, was urinating blood, and in tremendous pain and needed medical attention. She stated, "Put in a blue slip"; to which plaintiff responded "I'm in control status, I can't!"; upon which she left the area without further comment.

(35) On 3-11-16, at approximately 12:50 p.m., Lt. Carnal, C.O. Dave, and others came to plaintiff's cellfront to escort him to HSU; at which time, in front of C.O. Dave, he was able to force the pen insert out of his penis (but not the paper-clip); and, when Lt. Carnal opened the celldoor trap/slot plaintiff handed the pen insert out to him.

(36) Thereafter, supra (35), plaintiff was removed from the cell, placed in a wheelchair and taken to HSU to be examined by defendant Dr. Syed.

(37) At the 3-11-16, medical visit with defendant Syed plaintiff told him that he had engaged in self-harm due to the pain from dental surgery, that he was urinating blood due to the paperclip still in his penis, showed him his open wound on his right arm, told him he was in unbearable pain and needed pain relief.

-9-

(38) At the medical visit, supra (37), defendant Syed asked Plaintiff why wasn't he taken to the hospital to have his arm stitched up. Plaintiff explained that he was simply denied it, and he requested that he then receive stitches and pain relief, but defendant Syed said it was too late for stitches at that time but told Plaintiff to lie down on the gurney so he could examine his penis.

(39) Once Plaintiff laid down on the gurney, supra (38), defendant Syed had the C.O.s in the room (at least 4 of them) hold Plaintiff down and, upon doing so, without first providing any pain relief, began to stick some tweezer like instrument into Plaintiff's penis to try and retrieve the paperclip but couldn't because it was stuck; and, moreover, Plaintiff was shrieking and crying in pain so loudly and painfully that C.O. Swanson told defendant Syed "No man, just leave him alone.", and he did.

(40) Thereafter, supra (39), defendant Syed said he'd have an X-ray ordered. Additionally, during this time, supra (38)-(39), defendant Syed placed some adhesive strips on Plaintiff's arm wound.

(41) Thereafter, supra (38)-(40), Plaintiff was placed back in the control cell.

(42) While back in the control cell, at approximately 2:40 p.m., on 3-11-16, C.O. Tobby saw Plaintiff lying on the floor with blood coming

out of his penis and crying. Upon seeing Plaintiff like that he ran to contact a supervisor (i.e., Lt. or Capt.) and have HSU notified.

(43) At approximately 2:55 or 3:00 p.m., on 3-11-16, Plaintiff was again removed from the cell and wheelchaired to HSU, but was seen by an RN/Nurse this time who simply examined Plaintiff, though did not provide any further treatment. Plaintiff was placed back in the cell.

(44) Plaintiff continued to urinate blood, experience agonizing pain, and began to throw-up, from 3-11-16 — 3-12-16.

(45) On 3-12-16, at approximately 8:30 p.m., Plaintiff held the trap to the celldoor, refused to allow it to be closed, and demanded medical attention and pain relief, but was denied.

(46) On 3-15-16, an X-ray was done on Plaintiff's stomach to look at his bowel, not his penis where the paperclip was lodged.

(47) On 9-27-16, at approximately 10:15 A.M., defendant LaMarca reopened Plaintiff's left gum to extract the piece of tooth he had left in there after the dental surgery he'd conducted on Plaintiff on 3-8-16, supra (7). Again, Plaintiff was only given acetaminophen for pain.

(48) During this time period, 3-8-16 to 9-27-16, supra (7)-(47), and following it, Plaintiff continued to endure excruciating pain in his

-11-

penis and bleed from it, especially during urination, continued to experience severe dental pain, and tremendous pain in his right arm frequently also; yet, the strongest pain medication he was given was Acetaminophen and/or Ibuprofen, and it was totally ineffective at alleviating the pain. Moreover, Plaintiff continued to complain to Mashak and Syed, to no avail.

(49) Subsequently, on 8-29-16, Plaintiff again threatened to engage in self-harm, even kill himself, unless he received proper medical attention and pain management. He was instead stripped naked and placed in a control/observation cell, with nothing, and naked.

(50) On 10-21-16, Plaintiff was transferred from CCI to WSPF.

(51) On 10-23-16, Plaintiff wrote WSPF HSU manager, defendant Jolinda Waterman, and informed her of his urinating blood, the self-harm he'd engaged in, the paperclip in his penis, the injury to his arm, and the pain he was still in due to these two injuries.

(52) By this time, supra (51), Plaintiff's dental pain had subsided.

(53) Since being at WSPF Plaintiff has written to HSU staff and defendant Waterman over 50 times, and repeatedly complained to defendant McArdle also, about the pain being endured due to his injury to his penis and right arm, supra (51), and has requested to be treated, cured, the pain alleviated, and to be seen by an outside hospital and/or specialist.

(54) Multiple urinalyses, at both CCI and WSPF, over 10, all confirmed blood in Plaintiff's urine; which has also been seen visibly on numerous occasions as well, since 3-10-16.

(55) Defendants Waterman and McArdle refused Plaintiff stronger pain medication despite him informing them the pain medication was not effective, and that it was painful and difficult to even walk.

(56) It was a nurse practitioner, Tannia Bonson, who assured Plaintiff she'd get him referred to U.W. Hospital Urology department.

(57) On 1-27-17, Plaintiff was transported by WSPF C.O.s, as ill-arranged by WSPF HSU manager defendant Waterman, and McArdle, to U.W. Hospital. However, upon arrival U.W. Hospital stated the appointment was the week before. Consequently, Plaintiff did not get to to see the U.W. Urologist until 3-31-17.

(58) On 3-31-17, Plaintiff was again taken to the U.W. Hospital, their urology department, and this time did see the urologist.

(59) During the urology visit, supra (58), plaintiff was prepared by a nurse, prior to examination, with a numbing medication that eliminated the pain from his penis.

(60) Thereafter, supra (59), the urologist examined Plaintiff and

-13-

stuck a small camera (on the end of a cord-like device) into his penis, located the paperclip and extracted it. He informed Plaintiff that he'd continue to urinate blood for a few days, will have scar tissue and penis will not feel normal, but he would receive vicodin for the pain.

(61) Plaintiff was provided a wheelchair at U.W. Hospital, and provided one to be escorted back to his cell at WSPF, A-#110.

(62) Once back at WSPF he was seen by Nurse R. Feldman, and she denied him his pain medication from 4:00 p.m. until 7:30 p.m., despite knowing it was prescribed to Plaintiff for serious pain in his penis, following surgery only hours earlier that day.

(63) At 7:30 p.m. medication pass, on 3-31-17, Nurse Feldman arrived at Plaintiff's cell, finally, to give him his pain medication. Since he could not stand he extended a piece of paper (held in his hand) to the trap/slot on the door and asked her to place it on there. She asked the C.O. if she should give him the medication without him coming to stand at the door, although he was still visible, only sitting on the end of the bed. Plaintiff told defendant Feldman the C.O. has no say so on any medical decision, upon which she became very hostile, aggressive, angry and dismissive with plaintiff and refused to give him his medication and left. Plaintiff was in excruciating pain that entire night, all the way until the next day.

(64) The scar tissue of the wound on Plaintiff's right arm still expands and often feels like it's gonna rip open — especially when he does arm strengthening exercises. He's informed defendant McArdle of this, but she has said because the wound was not stitched up early on the only thing she can do is inject the wound with a liquid medicine/solution that may make the wound smaller.

(65) Plaintiff has requested to be seen by a specialist regarding his arm wound, but defendants Waterman and McArdle have denied his request.

(66) Plaintiff still, even to this day, endures sharp pains in his right arm at the wound area, and sometimes radiating throughout his arm and hand; and also experiences sharp pains in his penis.

(67) Plaintiff has requested to be seen by a specialist regarding the ongoing sharp pains in his penis, but has yet to see one. Plaintiff has made this request to both defendants Waterman and McArdle.

(68) Defendants Mashak and Wittman were at all relevant times (i.e., while Plaintiff was at CCI) responsible for having policies, procedures and protocols in place to ensure that a prisoner's urgent or emergency medical needs are met even when HSU staff have went home for the day (or have otherwise left CCI); including, but not limited to, having the prisoner transported to the local hospital for treatment.

(69) Defendants Mashak and Dittman were at all relevant times (i.e., while Plaintiff was at CCI) responsible for ensuring that CCI staff, including Defendant Miller, were properly trained and capable of executing CCI's policies, procedures and protocols in place to ensure that a prisoner's urgent or emergency medical needs were met even when HSU staff were not at the prison; including, but not limited to, having the prisoner transported to the local hospital for treatment.

(70) Defendants Mashak and Dittman knew, prior to 3-8-16, that it was necessary to have proper policies, procedures and protocols in place to ensure that a prisoner's urgent or emergency medical need would be met whether or not HSU staff were at the prison; including, but not limited to, having the prisoner transported to the local hospital for treatment; and, moreover, they knew it was also necessary to have the CCI security supervisors, such as defendant Miller, trained to properly execute such policies, procedures and protocols, to ensure the health and safety of the prisoners.

(71) Despite defendants' Mashak and Dittman's awareness of the need to have such policies, procedures and protocols in place, and their awareness of the need to have staff, such as defendant Miller, trained to execute them, supra (68) - (70), defendant Mashak and Dittman either failed to have such policies, procedures and protocols in place on 3-10-16 to 3-11-16, or staff trained to execute them —

— i.e., defendant Miller, on Plaintiff's behalf.

(72) As a proximate result of the aforesaid actions and/or omissions of defendants, supra (7) - (71), Plaintiff has suffered, and continues to suffer, extreme and wanton physical, emotional and mental pain and suffering, and cruel and unusual punishment.

## Causes of Action

(73) The actions and/or omissions of defendants LaMarca and Nurse Barb, following Plaintiff's first dental surgery, supra (7) - (18), of not providing adequate pain relief and leaving a jagged tooth in his gum, knowingly, constitutes both an 8th amendment violation under the U.S. Constitution and state law medical malpractice as well.

(74) The actions and/or omissions of defendant LaMarca, following Plaintiff's second dental surgery on 9-27-16, supra (99) - (49), of not providing adequate pain relief constitutes both an 8th amendment violation under the U.S. Constitution and state law medical malpractice as well.

(75) The actions and/or omissions of defendants Miller, Valerious, and Syed, following Plaintiff's acts of self-harm, disfigurement, injury and 3-8-16 dental surgery, supra (7) - (50), of not having him transported for outside medical treatment, stitches, surgery and receipt of adequate pain man-

-agement, nor ensuring he received it at CCI, constitutes both an 8th amendment violation by all, and medical malpractice by defendants Valerious and Syed under state law as well.

(76) The actions and/or omissions of defendants Mashak and Dittman as pleaded above, supra (68) - (71), constitutes deliberate indifference 8th amendment violation under the U.S. Constitution by both defendants, and also state law medical malpractice by defendant Mashak.

(77) The actions and/or omissions of defendants Waterman, Feldman, and McArdle, as pleaded above, supra (50) - (67), in failing to provide plaintiff adequate pain relief, even when prescribed, and defendants' Waterman and McArdle's delay in ensuring he was examined by a neologist, refusing to allow him to be seen by a specialist for his arm injury, or adequately treating the arm wound themselves, and failing to adequately treat his ongoing sharp pains in his right arm and penis, constitutes both and 8th amendment violation under the U.S. Constitution and state law medical malpractice as well.

## Jury Trial Demand

(78) Plaintiff demands a trial by jury.

## Relief Sought

(78) Plaintiff seeks the following relief:

(i) <u>Declaratory Relief</u>, finding defendants have indeed violated Plaintiff's 8th amendment Constitutional rights, as well as engaged in medical malpractice, as pleaded above, supra (7) - (77);

(ii) <u>Injunctive Relief</u>, enjoining defendants to permit Plaintiff to be seen by a specialist regarding his arm wound, and to receive treatment for it and also the sharp pains he continues to experience in both his arm and penis;

(iii) <u>Compensatory Relief</u>, in the form of a separate damages amount awarded against each defendant, separately, to determined by the jury;

(iv) <u>Punitive Relief</u>, in the form of a separate damages amount awarded against each defendant, separately, to be determined by the jury;

(v) The costs and fees incurred as a result of bringing forth this action, attorney fees included, and all other relief the Court deems appropriate and equitable.

Dated this 1ST day of August, 2017.

Signed: _____
Kevin Sierra-Lopez, #576301, Pro Se.
P.O. Box 9900 – WSPF
Boscobel, WI. 53805-9900

Prepared By:
Mustafa-El K.A. Ajala
Prisoner-to-Prisoner Pro Se Legal Aid,
Pursuant to DOC Admin. Code 309.55