IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KEVIN SIERRA-LOPEZ,

                    Plaintiff,                          OPINION AND ORDER

          v.                                                17-cv-599-wmc

MICHAEL LAMARCA, BARBARA HARRIS
a/k/a Nurse Barb, JASEN MILLER, DENISE
VALERIUS, SALEM SYED, JOLINDA
WATERMAN, REBECCA TRACY, SANDRA
MCARDLE, and LORI ALSUM,

                    Defendants.

---

*Pro se* plaintiff Kevin Sierra-Lopez asserts various Eighth Amendment claims against

employees or contract agents of the Wisconsin Department of Corrections ("DOC")

working at the Columbia Correctional Institution ("CCI") or Wisconsin Secure Program

Facility ("WSPF"). Before the court are two motions for summary judgment, one by

defendants Dr. Michael Lamarca, Jasen Miller, Denise Valerius, Dr. Salam Syed, Jolinda

Waterman and Lori Alsum, who are all represented by the Department of Justice (dkt.

#137), and the other motion by defendant Sandra McArdle, who as a contract employee

working at WSPF retained her own counsel (dkt. #146).[1] For the reasons that follow, the

---

[1] In addition to these defendants, plaintiff was also granted leave to proceed against a defendant identified as "Barbara" or "Barb Harris" or "Nurse Barb." However, the DOC was unable to identify this defendant, and, therefore, she has not yet been served. In a February 28, 2020, order, the court informed Sierra-Lopez that he needed to provide additional identifying information about that defendant or she who would be dismissed without prejudice if not served within 60 days. (2/28/20 Order (dkt. #152) 3.) To date, plaintiff has not provided any additional information, nor has this defendant been otherwise identified or served. Therefore, the court will dismiss without prejudice the claims asserted against defendant "Barbara or Barb Harris a/k/a Nurse Barb." In addition, plaintiff was granted leave to proceed against defendant Rebecca Tracy (f/k/a Feldman), who was a contract nurse at WSPF, based on plaintiff's allegation that she denied him Vicodin after he returned from having a medical procedure in March 2018. However, defendant Tracy was not

court will grant summary judgment to defendants Lamarca, Miller, Valerius, Alsum and McArdle, but will deny defendants Syed and Waterman's motion. The court will also grant plaintiff's most recent motion for assistance in recruiting counsel. As such, all remaining pre-trial deadlines and the trial date are struck.

## UNDISPUTED FACTS[2]

### A. Background

For all times relevant to his complaint, plaintiff Kevin Sierra-Lopez was an inmate in the custody of the DOC. From March 8, 2016, to October 21, 2016, Sierra-Lopez was housed at CCI. On October 21, Sierra-Lopez was transferred to WSPF.

As for the defendants, Michael Lamarca, D.D.S, was employed as a dentist at CCI for all relevant times. Dr. Lamarca has been licensed to practice dentistry in the State of Wisconsin continuously since May 23, 2003. Defendant Salam Syed, M.D., was formerly employed as a physician at CCI from 2014 until 2018. Dr. Syed has been continuously licensed as a physician in Wisconsin since 2009. Defendant Denise Valerius has been employed as a Nurse Clinician II at CCI. From late 2014 through early 2019, Nurse Valerius worked weekends at CCI, mainly Saturdays and Sundays from 6:00 a.m. to 10:00 p.m. Valerius has been licensed as a registered nurse in Wisconsin since May 2008. Defendant Jasen Miller was formerly employed as a Captain at CCI from March 2015

---

served until April 10, 2020, and only answered the complaint on April 23, 2020. Accordingly, the court will set a deadline of August 3, 2020 for her to file a motion for summary judgment.

[2] Unless otherwise noted, the following facts are material and undisputed. The facts are viewed in the light most favorable to the plaintiff as the non-moving party, and all reasonable inferences are drawn in his favor.

through November 2017.  In that capacity, Captain Miller was responsible for the overall direction and operation of the institution on an assigned shift, supervising Correctional Officers, Sergeants and Lieutenants.

Defendant Jolinda Waterman was the Health Services Manager at WSPF.  Sandra McArdle was a Nurse Practitioner at WSPF from January 1, 2017, until November 2, 2019.  Lori Alsum has been employed as the Health Services Nursing Coordinator for the DOC's Bureau of Health Services since December 2009.  Alsum has been licensed as a registered nurse in Wisconsin since 1992.

### B. Dental Treatment by Dr. Lamarca

At the beginning of each working day, Dr. Lamarca reviews inmates' Dental Services Requests ("DSR"), placing them into one of five categories based on the level of urgency. On March 8, 2016, Dr. Lamarca received a DSR from plaintiff Sierra-Lopez complaining of pain from his wisdom teeth.  Dr. Lamarca saw Sierra-Lopez that day and extracted two of his wisdom teeth.  After the teeth were removed, Dr. Lamarca visually inspected both teeth and sockets, and he palpated the gums to ensure that there were no malformations or lumps, representing that none were detected.  While Sierra-Lopez contends that Dr. Lamarca did not conduct this inspection because if he had, "no piece of tooth would have been left[] in plaintiff['s] mouth" (Pl.'s Opp'n to Defs.' PFOFs (dkt. #155) ¶ 20), defendants respond that there was no tooth fragment at the time of the extraction, but rather a bone chip developed later, as an unavoidable complication.  Defendants also represent that Sierra-Lopez received notice of this risk in the Authorization and Consent

to Surgery and Drug Administration form that he reviewed and signed before his teeth extraction.

Following the extraction, Dr. Lamarca prescribed Sierra-Lopez a 30-count supply of ibuprofen 800 mg and a 30-count supply of acetaminophen 500 mg for pain management, as well as an antibiotic to guard against potential infection. Sierra-Lopez does not dispute that he received all three of these prescriptions, but maintains that the pain medications were inadequate to deal with his severe pain.

Dr. Lamarca also maintains that he attempted to see Sierra-Lopez on April 5, 2016, almost a month after the extraction and after he had complained to a psychiatrist about continued, extreme pain. However, again according to Lamarca, Sierra-Lopez was by then on observational status, and security staff will not remove an inmate on observational status for a dental appointment absent a medical emergency. (Lamarca Decl. (dkt. #143) ¶ 19.) Sierra-Lopez maintains that his treatment need at that point *was* "urgent" as defined by the DOC's policy on prioritizing dental appointments, because a delay "could result in undue pain and suffering." (Pl.'s PFOFs (dkt. #157) ¶ 6.)[3]

During a follow-up appointment on May 10, now two months after the extraction, Dr. Lamarca noted that the site was healing well, and that there were no malformations or lumps on his gums indicating the presence of a bone fragment. Sierra-Lopez contends that these notes only refer to the bottom gum, but do not address the top gum where he was

---

[3] Defendants purport to object to this proposed finding on the basis that a dentist triage policy is not material to plaintiff's deliberate indifference or medical malpractice claims, despite Dr. Lamarca appearing to rely on security policy as his reason for being unable to see plaintiff. Regardless, this will be addressed in the opinion below.

having continued pain.  Regardless, Lamarca prescribed him additional ibuprofen for his "lingering pain."  Then, in response to two subsequent DSRs in late May and early June, Dr. Lamarca simply advised Sierra-Lopez to follow up with the nursing staff for delivery of his medications given that he had already ordered a prescription.

On September 20, 2016, now more than six months after the extraction, Sierra-Lopez submitted yet another DSR, complaining of a sharp pain in his left cheek.  Dr. Lamarca saw Sierra-Lopez one week later on September 27, and upon palpation, discovered what he described as a "non-vital bone fragment that had been rejected by the body." (Defs.' PFOFs (dkt. #139) ¶ 29.)  Again, Sierra-Lopez maintains that this piece of tooth was left by Lamarca when he extracted plaintiff's wisdom tooth.  In response, however, Lamarca explains:

> During the healing process, the body sometimes rejects a piece of non-vital bone and will eventually push the fragment out through the gums.  It is best to try to let the fragment work itself out, which can take several months to a year.  However, sometimes the fragments can be sharp and be irritating to the tongue or cheek, in which case a simple removal of the bone fragment may be warranted.  This is a routine occurrence in my current practice for bone fragments to develop and be removed.

(Lamarca Decl. (dkt. #143) ¶ 18.)  However, there is no dispute that on September 27, Dr. Lamarca removed the fragment, properly closed the site, and prescribed additional ibuprofen, acetaminophen and an antibiotic.  Even then, Sierra-Lopez contends that the prescriptions were inadequate to deal with his pain, and Lamarca knew that they were not working.

### C.  Contemporaneous Self-Harm Treatment

During roughly this same time period at CCI (March to October 2016), Captain Miller had been assigned as the Shift Supervisor on third shift on March 10, 2016, just two days after Sierra-Lopez's teeth were extracted.  On March 11, at approximately 12:05 a.m., Miller was notified that Sierra-Lopez reported committing acts of self-harm.[4]  On examination, Miller discovered what he described as a small cut on Sierra-Lopez's right forearm with dried blood on it.  In response, however, Sierra-Lopez contends it was a "big wound that needed to be stitched-up."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #155) ¶ 33.) Miller also noted that Sierra-Lopez had claimed he shoved foreign object(s) into his penis -- specifically, a paperclip or a pen insert.  (*See also* Pl.'s PFOFs (dkt. #157) ¶¶ 17-18 (citing correctional officer's accounts that Sierra-Lopez reported that he had inserted a metal object in his penis and that these reports were relayed to their supervisor); *id.* ¶ 19 (Miller also indicating that Sierra-Lopez told him he "shoved a foreign object into his penis").)

In response to all this, Captain Miller attempted to treat Sierra-Lopez's arm by wrapping it with gauze; he also instructed his correctional officers to strip search Sierra-Lopez to ascertain whether there were any objects in his penis that required immediate medical attention.   Miller also claims to have notified the on-call nurse, "Whalen," describing Sierra-Lopez's injuries as he saw them, and she, in turn, instructed Miller that he could wait to be seen in the morning.  Sierra-Lopez argues that if Miller's account of his injuries to the nurse had been accurate and complete, then he would have been transported

---

[4]  Plaintiff has a history of self-harming behavior during his incarceration, including several overdoses, fracturing his own fingers, swallowing pencils, *and* hanging himself.

to the hospital for immediate treatment.  Miller next placed Sierra-Lopez on "control status," which allowed for security staff to limit his property items to insure that Sierra-Lopez would not hurt himself further *and* required staff to conduct wellness checks every 30 minutes.[5]  Finally, at approximately 1:00 a.m., Captain Miller instructed correctional officers to provide Sierra-Lopez with acetaminophen and ibuprofen.

On the morning of March 11, Sierra-Lopez represents that he attempted to seek treatment from Nurse Valerius as she was passing medications to another prisoner in a nearby cell.  Valerius has no independent recollection of that incident, but represents that if she were on the unit, she would have reminded him of the proper way to request medical attention as required by CCI policy -- completing a Health Service Request ("HSR") form or reporting the need to an HSU staff member as they perform their weekly rounds.  If Sierra-Lopez was unable to complete an HSR because of property restrictions, he could also have asked security staff for assistance.  Moreover, at about 1:00 p.m. that same afternoon, there is no dispute that Sierra-Lopez actually saw Dr. Syed and Nurse Valerius for evaluation of his self-inflicted injuries, although plaintiff claims there were other people at the appointment.

According to Sierra-Lopez's medical record for that day, Dr. Syed noted his laceration was "not actively bleeding and was shallow in depth," prompting him to apply

---

[5] Although defendants do not submit proposed findings of fact based on his statements, Miller further avers that he called the Psychological Services Unit clinician, Dr. Persike, that same night to advise her of Sierra-Lopez's self-harm.  (Miller Aff. (dkt. #141) ¶ 11.)  Miller represents that *Persike* told him that she did not believe placing him on observational status was warranted.  (*Id.*) In contrast, Sierra-Lopez contends that he should have been placed on "observational status" to address his mental health issues, but plaintiff stops short of explaining why this alternative placement would have been material.

steri-strips to close the wound.  (Defs.' PFOFs (dkt. #139) ¶ 49 (citing Syed Decl. (dkt. #140) ¶¶ 10-11; Berg Decl., Ex. 1005 (dkt. #144-2) 87).)  Sierra-Lopez disputes the condition of his wound, saying that it was "deep and wide."  (Pl.'s Resp. to Defs.' PFOFs (dkt. #155) ¶ 49.)  There is no dispute, however, that Dr. Syed cleansed and disinfected the wound and applied the steri-strips.

During this same appointment, Dr. Syed also conducted an abdominal and penile examination, including using forceps to examine the inside of Sierra-Lopez's penis and obtained an ultrasound of his bladder.  (Syed Decl. (dkt. #140) ¶ 12.)[6]  Plaintiff purports to dispute these facts, but instead asserts that:  (1) Dr. Syed was aware Sierra-Lopez had inserted a paperclip and a piece of pen insert into his penis; and (2) the forceps Syed used were actually a "scissors tweezers," which were not used in subsequent examinations by a urologist.  (*Id.* ¶ 50.)  Sierra-Lopez also contends that although Syed's examination was very painful, he provided no medication for the pain.  While the parties appear to agree that Dr. Syed discovered no foreign body in Sierra-Lopez's penis during the examination, plaintiff again contends that Syed was "aware" of a paperclip and simply unable to remove it.

The day after Syed's examination, Saturday, March 12, 2016, Mr. Bussie advised

---

[6] In their proposed findings of fact, defendants represent that Dr. Syed ordered an "ultrasound of his bladder *and penile region*."  (Defs.' PFOFs (dkt. #139) ¶ 50 (emphasis added).)  Dr. Syed, however, simply avers that he ordered an ultrasound of his bladder, without any indication that it also covered his penis.  (Syed Decl. (dkt. #140) ¶ 12.)  For the reasons described below, the court finds this distinction material, and thus calls into question whether counsel for defendants was playing too loose with the facts in order to cover Dr. Syed's failure to take steps to insure that there was no foreign body in Sierra-Lopez's penis.

HSU that Sierra-Lopez was still reporting pain due to a foreign object in his penis.[7]  At that time, on-call HSU staff directed Bussie to tell Sierra-Lopez that a doctor would see him again on Monday, although apparently Dr. Syed ordered an x-ray of Sierra-Lopez's kidney, ureter and bladder (identified in the medical record as "KUB") on Tuesday, March 15, 2016, instead.  Again, however, Sierra-Lopez disputes that the x-ray actually covered this area, maintaining that it only showed his bowels, pointing out that while it is undisputed that the radiologist concluded that there was "[n]o radiopaque foreign body" present, the report appears to focus on plaintiff's bowels only.  (Berg Decl., Ex. 1005 (dkt. #144-2) 229) ("Nonobstructive bowel gas pattern.  Colonic fecal residual present may represent clinical constipation.  No radiopaque foreign body").)

Because plaintiff was already on ibuprofen and Tylenol, Dr. Syed also concluded that no further pain medication was deemed necessary.[8]  Moreover, Syed determined that the antibiotics Sierra-Lopez was on from his wisdom tooth removal would prevent any infection to his self-inflicted wounds.  Defendants also point out that as a nurse, Valerius could not prescribe medications, nor override or alter orders issued by an advanced care provider, and that she relied on Dr. Syed's medical judgment as to any follow-up treatment and orders for pain relievers.  However, Sierra-Lopez contends that Valerius was aware of his extreme pain, and she should have at least followed her chain of command to report it

---

[7] Bussie is presumably a CCI staff member, although his official position is not explained by the parties.

[8] Dr. Syed further avers that he declined to prescribe narcotic medication because he did not feel they were medical necessary and out of concern about potential abuse and dependency, especially for a patient like Sierra-Lopez who has a history of abusing and overdosing on medications.

to the Health Services Manager.

On June 2, 2016, Sierra-Lopez saw Dr. Syed again, this time complaining of blood in his urine.  In response, Dr. Syed ordered a urine test, which was conducted on June 17, 2016.  When the test came back positive for occult blood and nitrates, Dr. Syed ordered a series of scans to ascertain the cause of the blood in his urine, although those scans did not take place until more than two months later as detailed below.  At that appointment, Dr. Syed also prescribed ibuprofen 600 mg and Tylenol 1,000 mg for 10 days.  While plaintiff does not dispute this basic account of the June 2, 2016, appointment, he claims to have complained of blood in his urine *multiple* times before *and* asked to be seen by a specialist.  Specifically, plaintiff points to a note in his medical record dated May 13, 2016, in which he reported "pissing blood."  (Pl.'s PFOFs (dkt. #157) ¶ 30.)  Plaintiff also contends that the blood was caused by the paper clip in his penis.

On August 18, 2016, plaintiff underwent an ultrasound of his retroperitoneal area, which appears to include his kidneys and bladder.  Those results also produced an "Unremarkable sonographic evaluation of the kidneys and visualized urinary bladder.  There is no evidence for renal cortical thinning."  (Berg Decl., Ex. 1005 (dkt. #144-2) 228.)  His lab results from that day were also normal.  (*Id.* at 262.)  On August 23, 2016, Sierra-Lopez had another scan of his pelvis, which showed "no acute osseous abnormality.  No radiopaque foreign body."  (*Id.* at 227.)

On August 22, 2016, medical records indicate that Dr. Syed sought to refer Sierra-Lopez to a urologist, regarding the blood in his urine and history of insertion.  However, no referral was completed before Sierra-Lopez was transferred to WSPF on October 21,

2016, at which point Dr. Syed was no longer involved in Sierra-Lopez's care.

### D. Transfer to WSPF and Ongoing Medical Care

#### 1. Penile Injury

Six weeks after Sierra-Lopez's transfer to WSPF, in a document dated December 2, 2016, Health Service Administrator Waterman noted:

> Mr. Sierra-Lopez had transferred to WSPF on 10/23/16.  Mr. Sierra-Lopez has inserted a paper clip and two pen inserts into his genitalia 8 month[s] ago resulting in trauma, intermittent hematuria (blood in urine), infection, and chronic pain.  He was evaluated at CCI and a referral for urology was not completed when he was transferred to WPSF.  He was seen by HSU Staff RNs and NP Bonson, and had lab tests and imaging completed to determine source of bleeding, and pain . . . he is in the process  of a urology consult to further evaluate if there is any foreign object in his genitalia and to determine if scarring is an issue.

(Pl.'s PFOFs (dkt. #157) ¶ 40.)  Sierra-Lopez contends that his condition constituted an emergency, and Waterman should instead have immediately referred him for offsite services.

On February 7, 2017, plaintiff was apparently scheduled to be seen by a urologist at UW Health, although defendants represent that the appointment was canceled by UW Health.  Upset about the cancelation, Sierra-Lopez maintained that Nurse Practitioner McArdle should have arranged for his transport to Gundersen Boscobel Area Hospital to be seen on an emergency basis, although this did not occur.

On March 31, 2017, Sierra-Lopez was finally seen by a urologist at UW Health, Dr.

John Bell.[9]  The medical record reveals that

> the cystoscope was inserted into the urethral meatus without difficulty.  In the distal penile urethra, part of a paper clip was encountered.  This was grasped and removed without complication.  The cystoscope was then re-inserted into the urethra and the remainder of the urethra appeared normal as did the bladder.  Interestingly, there was no [real] evidence of urethral trauma where the paperclip was.

(Berg. Aff, Ex. B (dkt. #150-2) 5.)  Without explanation, Dr. Bell also noted that Sierra-Lopez "has been scheduled several times for cystoscopy, but has not shown up."  (*Id.*)

Because Sierra-Lopez continued to complain of pain after the March 2017 cystoscope, McArdle referred him to a urologist for another appointment on July 14, 2017.  At this appointment, Sierra-Lopez was seen by another UW Health urologist, David F. Jarrard, M.D.  Dr. Jarrard found "[n]o obvious etiology of patient's pain."  (*Id.* at 15.)  The urologist further explained that Sierra-Lopez may be experiencing "residual pain from his paperclip extraction and things are still healing."  (*Id.*)  Accordingly, Jarrard recommended Sierra-Lopez continue to take Tylenol for pain and be seen again in 6 months.

Since July 2017, Sierra-Lopez was prescribed and used a lidocaine jelly twice a day as needed, which was administered via a needleless syringe into his urethra.  While Sierra-Lopez purports to dispute this, stating that he was "finally pr[e]scribed with a new medication 'Lidocaine jelly] on May 2018" (Pl.'s Resp. to Defs.' PFOFs (dkt. #155) ¶ 72),

---

[9] The court is struck by the fact that the defendants represented by the DOJ submitted *no* proposed findings acknowledging that a urologist removed a piece of a paperclip in March 2017, approximately one year after Sierra-Lopez inserted the paperclip and reported this self-harm injury to the CCI defendants.  Instead, the court learned this fact only through defendant McArdle's submissions.

he stops short of disputing that there was an earlier prescription for this medication.[10]
Plaintiff also contends that there were "several times" when he experienced difficulty
receiving the medication.  (*Id.* ¶ 73.)

Sierra-Lopez was next seen by a UW Health urologist, Viascheslav Iremashvili,
M.D., on November 3, 2017, which resulted in a normal physical examination.  (Reid
Decl., Ex. B (dkt. #150-2) 24.)   Although the urologist recommended Tylenol and
Ibuprofen for pain control, he also said no further follow-up with urology was required.
Still, he recommended that Sierra-Lopez be seen by a pain management clinic.  Consistent
with that recommendation, NP McArdle referred Sierra-Lopez to a pain specialist on
November 30, 2017.

On July 9, 2018, plaintiff again saw a urologist at Gunderson Hospital and Clinics,
Thomas A. Londergan, M.D., based on NP McArdle's referral to address Sierra-Lopez's
complaints of "intermittent pain in the proximal penile shaft radiating up into his abdomen
and down into his rectum."  (*Id.* at 68.)  At that time, the urologist performed a cystoscopy,
in which he noted that there "was a little bit of minor scarring visible on the posterior
urethral wall, but no stricture was noted."  (*Id.*)  In all other respects, Dr. Londergan found
the examination was normal, concluding, "I am not sure as to the exact cause of his painful
symptoms, but there was no evidence of any ongoing urological issues."  (*Id.*)

Sierra-Lopez also was referred to a pain clinic, where he met with Dr. Peggy Kim on

---

[10] According to defendants, Sierra-Lopez had access to this medication upon request to the security
staff.  While Sierra-Lopez purports to dispute this fact as well, he simply points out that the
medication was only available in the "a.m. first medication pass and p.m. last medication pass,"
although this appears to be consistent with defendants' account that the prescription was for use
twice a day.

July 20, 2018.  Dr. Kim recommended, "[i]f his mental health improves in the future, other neuropathic pain medications could potentially be considered such as gabapentin, Lyrica, Cymbalta, or TCA.  However, at this time, I would refrain from starting these medications until he is more stable."  (Defs.' PFOFs (dkt. #149) ¶ 75 (citing Berg Decl., Ex. 1005 (dkt. #144-2) 149-54).)  In the meantime, Dr. Kim recommended continued use of the lidocaine injections.

On December 5, 2018, Sierra-Lopez filed Offender Complaint WSPF-2018-24961, alleging that he was denied Gabapentin.  The Inmate Complaint Examiner rejected the complaint on the grounds that Sierra-Lopez submitted it beyond 14 calendar days from the date of the occurrence.  After Sierra-Lopez filed a request for review of the rejected complaint, Nurse Coordinator Alsum was assigned to review the complaint.  Alsum avers that if an inmate complaint is forwarded to her, she reviews the necessary records and contacts the appropriate staff to ensure a substantive response is given to the inmate.  Alsum agreed that Sierra-Lopez's complaint was appropriately rejected.  Because that grievance dealt with complaints of pain, Alsum reviewed the records attached to the complaint and found that Sierra-Lopez's advanced care provider, presumably NP McArdle, had reviewed the offsite provider's recommendations and responded to Sierra-Lopez's request regarding Gabapentin.  At the same time, Nurse Alsum had no involvement in determining the treatment an inmate received for a specific condition, and she does not and cannot override the treatment decisions of advanced care providers as part of her reviewing authority.

### 2. Arm Injury

While incarcerated at WSPF, NP McArdle also determined that Sierra-Lopez's 2017 arm injury was a keloid and recommended prednisone injections, although she informed him that the injections would not make the keloid disappear or address the sensation he felt while working out.[11]   McArdle provided prednisone injections on June 6, July 20, and August 30, 2017, which she contends, and Sierra-Lopez does not dispute, resulted in a marked improvement of the keloid.   Still, Sierra-Lopez maintains that the injections "did not work," as evidenced by his eventual referral to a plastic surgeon.

While NP McArdle referred Sierra-Lopez to a plastic surgeon on November 14, 2017, plaintiff points out that he had already been referred to a plastic surgeon by a Dr. Miller on August 28, 2017.   (Reid Decl., Ex. 2 (dkt. #150-2) 21.)   On March 23, 2018, Sierra-Lopez had plastic surgery to remove keloid tissue.   Upon his return to WSPF, NP McArdle prescribed Hydrocodone in an equivalent dose as that of the Oxycodone recommended by the surgeon, because the DOC did not permit Oxycodone.   On March 26, McArdle extended the prescription an additional two days.

As of April 2018, the record reflects that the surgical incision was healed, the sutures were removed, and Sierra-Lopez opted against monthly injections of prednisone to keep any keloid formation suppressed.   Sierra-Lopez maintains that he has not refused

---

[11] A "keloid" is a raised overgrowth of scar tissue that occurs at the site of a skin injury, where trauma, surgery, blisters, vaccinations, acne or body piercing have injured the skin.  Less commonly, keloids may form in places where the skin has not had a visible injury.  Keloids differ from normal mature scars in composition and size.   "Keloids: What Is It", Harvard Medical School, https://www.health.harvard.edu/a_to_z/keloids-a-to-z.  On summary judgment, NP McArdle points out that on July 29, 2016, while temporarily housed at Brown County jail, Sierra-Lopez appeared to have cut himself in the same arm wound as the March 2016 incident.

subsequent treatment for his arm; at the same time, defendants point out that since April 2018, Sierra-Lopez had not submitted any HSRs reporting arm pain.  In addition, there appears no dispute that on May 17, 2018, McArdle referred Sierra-Lopez for a right lower arm EMG due to complaints of pain and tingling in his arm, which were normal.

With respect to both injuries, NP McArdle explained to Sierra-Lopez on several occasions that the DOC non-formulary committee would only approve Gabapentin if neuropathic pain was established.[12]   While neither UW Health nor Gunderson would perform a nerve conduction test of his perineal area, including his penis, McArdle did not believe that his penile pain was neuropathic in nature.  Moreover, neither Gunderson Urology nor UW Urology could find a cause for his continuing penile pain and had no other treatment options.  Plaintiff does not dispute this, but points out that while housed at Kenosha County Jail at the time he filed his response to defendants' motion for summary judgment, he was still being prescribed 900 mg of Gabapentin.

Plaintiff transferred out of WSPF in July 2019.  He was offered another consultation with a pain specialist before his release, but left the appointment before he could speak with the physician.

OPINION

## I.  Eighth Amendment Deliberate Indifference Claims

As set forth in the opinion and order screening plaintiff's claims to go forward, the

---

[12] Nurse McArdle also consulted with psychiatry on or about February 11, 2019, about whether Sierra-Lopez could be prescribed Duloxetine, a precursor for Gabapentin, and was advised against it.  McArdle agrees that Duloxetine would not be reasonable in light of plaintiff's history of self-harm.

Eighth Amendment affords prisoners a constitutional right to medical care. *See Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). To prove his claims of deliberate indifference, plaintiff must put forth sufficient evidence from which a reasonable jury could find that: (1) he had an objectively serious medical need; and (2) defendants were deliberately indifferent to it. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008).

"A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). For purposes of summary judgment, defendants do not dispute that plaintiff suffered from objectively serious medical needs. Instead, defendants seek summary judgment on the basis that they were not deliberately indifferent to those needs.

As for the second element, a defendant must be subjectively aware of an inmate's serious medical need -- that is, he must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Moreover, as the court explained in its screening order, plaintiff's claims turn on his proof with respect to each individual defendant, rather than a claim against the defendants collectively. *See Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) (explaining that to establish liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an individual personally caused or participated in a constitutional deprivation). As such, the court will consider plaintiff's evidence as to each

individual defendant.

## A. Dr. Michael Lamarca

First, with respect to CCI's dentist Dr. Michael Lamarca, plaintiff contends that Dr. Lamarca was deliberately indifferent to his wisdom tooth extraction pain in three ways: (1) Dr. Lamarca failed to perform the wisdom tooth extraction properly on March 8, 2016, resulting in a tooth fragment remaining; (2) he refused to see him on April 5, 2016, in response to Sierra-Lopez's complaints of severe pain; and (3) he failed to provide adequate pain medication.

As to the first of these claims, the undisputed record does not support plaintiff's theory that Dr. Lamarca botched the wisdom tooth extraction by leaving a tooth fragment behind.   Rather, the facts at summary judgment support a finding that Sierra-Lopez suffered from an unfortunate, but unavoidable, complication where a bone chip developed *later*.  Plaintiff offers no evidence or argument in response to this explanation, other than to reiterate his lay speculation that Dr. Lamarca failed to perform the tooth extraction correctly.  Absent any evidence to support this theory, the court agrees no reasonable jury could find plaintiff met his burden of proving this aspect of his claim against Dr. Lamarca. At best, the jury would be guessing.[13]

Second, plaintiff also contends that Dr. Lamarca ignored his complaints of severe pain by failing to see him on April 5, 2016, and by failing to provide adequate pain

---

[13] The court recognizes that Sierra-Lopez did not have the benefit of an expert in prosecuting this claim.  Because the court is recruiting pro bono representation for Sierra-Lopez, counsel is free to explore whether there is a medical basis for disputing Lamarca's explanation for this complication. If so, plaintiff is free to move for consideration on this order dismissing Dr. Lamarca.

medication.  Dr. Lamarca avers that he attempted to see plaintiff on April 5, 2016, after Lamarca had received a referral from psychiatry, reporting that Sierra-Lopez was suffering from extreme pain, but that the security staff refused to remove him from observational status for a dental appointment absent an emergency.  While plaintiff contends that his tooth pain constituted an emergency, Dr. Lamarca apparently abided by DAI policy requiring a *life-threatening* emergency in determining that Sierra-Lopez did not fall within that category.  (Lamarca Decl. (dkt. #143) ¶ 9.)  Plaintiff fails to put forth evidence to support a finding that Lamarca was aware of a substantial risk of harm if he was not seen on April 5 and ignored that risk.

Third, with respect to pain management, the record reflects that Dr. Lamarca provided over-the-counter pain medication prescriptions following the tooth extraction and renewed those prescriptions on May 10, 2016, when Dr. Lamarca saw plaintiff for complaints of pain and difficulty eating, as well as responding to his requests for additional pain medication on May 31 and June 7, 2016, by directing plaintiff to contact the nursing staff if he was not receiving his medications.  The last request Lamarca received from Sierra-Lopez was dated September 20, 2016, and he saw him one week later to address his left cheek pain.  On this record, a reasonable jury could not find that Dr. Lamarca was deliberately indifferent to Sierra-Lopez's complaints of mouth pain.[14]

---

[14] Plaintiff was also permitted to proceed on a state-law medical malpractice claim against Dr. Lamarca.  In light of the court's decision to grant summary judgment to Lamarca on plaintiff's constitutional claim, the court will decline to exercise its supplemental jurisdiction over the state law claim and will dismiss it without prejudice.

### B. Captain Jasen Miller

As for plaintiff's deliberate indifference claim against Captain Jasen Miller, there appear to be two bases:  (1) Miller misrepresented Sierra-Lopez's medical condition in his call with Nurse Whalen; and (2) Miller placed Sierra-Lopez on control status, rather than observational status, in violation of DAI policy.  As for the first theory, plaintiff offers no evidence to support a reasonable inference that Miller materially misrepresented Sierra-Lopez's injuries in his conversation with Nurse Whalen, the on-call nurse, in the early morning hours of March 11.  In particular, Miller avers that he reported both that Sierra-Lopez had a small cut on his arm with dried blood and claimed to have shoved something up his penis, although correctional officers did not visually observe any insertion or other signs of penile injury.

Based on this description, there is no dispute *Nurse Whalen* determined that plaintiff could wait to be seen in the morning.  Although plaintiff contends that the cut on his arm was much larger than a "small cut," he stops short of claiming that there was active bleeding at the time Miller saw it, nor does plaintiff dispute that Miller wrapped his arm with gauze.  Moreover, with respect to his penile injury, plaintiff does not contend that Miller or any other officer actually *saw* him inserting items in his penis nor that his injury was visible.  Accordingly, Miller's description of Sierra-Lopez's condition appears materially accurate -- or at the very least, not deliberately indifferent.  Finally, even if his description amounted to negligence, Miller was entitled to rely on Nurse Whalen's medical care professional's opinion in determining whether emergency medical treatment was required.  *See, e.g.*, *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (explaining that "non-medical

20

professional defendants" are "entitled to rely on the medical professionals' determination") (citing cases).

Plaintiff further complains of Miller's failure to follow DAI policy by placing him on control status, rather than observational status, but a violation of a prison policy does not establish a constitutional violation. *See Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state law or, in this case, departmental regulations and police practices.").   More critically, plaintiff fails to explain why this distinction is material in terms of the treatment he received or did not receive on March 11, 2016.  There is no dispute that by being placed on control status, Miller ensured that Sierra-Lopez (1) would not have access to property that he could use to harm himself and (2) would be checked by security staff every thirty minutes.

Based on this undisputed record, the court concludes that plaintiff has failed to put forth sufficient evidence from which a reasonable jury could conclude that Miller was deliberately indifferent to plaintiff's serious medical needs.

### C. Nurse Denise Valerius

Next, plaintiff asserts claims against defendant Nurse Denise Valerius based on:  (1) her delay in treating plaintiff on March 11, 2016; (2) her management of his pain medication; and (3) her failure to follow DAI policy securing emergency treatment at a hospital.

With respect to the first claims, plaintiff complains that Nurse Valerius refused to see him at 7:30 a.m. on March 11 while passing medication to another inmate in a nearby

cell.  Instead, plaintiff had to wait until 1:00 p.m. to see Valerius and Dr. Syed.  Plaintiff has failed to put forth any evidence, nor can the court infer a reasonable finding, that this short delay in treatment exacerbated his medical condition.  *See Jackson v. Pollion,* 733 F.3d 786, 790 (7th Cir. 2013) ("No matter how serious a medical condition is, the sufferer from it cannot prove tortious misconduct (including misconduct constituting a constitutional tort) as a result of failure to treat the condition without providing evidence that the failure caused injury or a serious risk of injury.").  Moreover, while the Seventh Circuit has recognized that subjecting a prisoner to prolonged, extreme pain can give rise to an Eighth Amendment violation, the length of delay in treatment in all of those cases were measured in days, not hours.  *Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (explaining that a "few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference") (citing cases).  Finally, it appears that Nurse Valerius was prioritizing the task at hand -- distributing medications to other inmates -- and plaintiff's option was to submit an HSR to be seen, which given the timing is likely what occurred.  As such, the court agrees with defendants that a reasonable jury could not find that Valerius was deliberately indifferent to Sierra-Lopez's medical needs by delaying treatment by five to six hours.

As for Sierra-Lopez's second claim -- that Valerius was deliberately indifferent in failing to manage his medication -- there appears to be no dispute that plaintiff was generally prescribed Tylenol and ibuprofen for his wisdom tooth extraction by Dr. Lamarca, and Dr. Syed believed that those medications were sufficient to cover his pain needs with respect to his March 11 self-injuries.  Moreover, Dr. Syed renewed those same

pain prescriptions on June 2, and Dr. Lamarca prescribed additional Tylenol and ibuprofen on September 27, after he had removed a bone fragment near the teeth extraction.  As such, plaintiff had access to over-the-counter pain medication during the relevant period.  While plaintiff would still fault Valerius for "never prescribe[ing] him any pain relief medication" (Pl.'s Opp'n (dkt. #154) 9), there is no dispute that, as a nurse, Valerius did *not* have the authority to prescribe Sierra-Lopez stronger prescription medications.  *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (noting that nurses lack authority to prescribe medication and may generally defer to instructions of physicians, unless those instructions will harm the patient).

Finally, plaintiff claims that Valerius was deliberately indifferent in failing to follow DAI policy to secure emergency treatment or hospitalization in response to plaintiff's May 13, 2016, HSR, which reported that he was urinating blood.  As noted above, however, the fact that Valerius may have violated DAI policy does not establish a constitutional violation.  *See Scott*, 346 F.3d at 760.  Further, the cited policy on which plaintiff would rely simply requires a prison to designate a local facility for emergency services; this policy did *not* require Nurse Valerius to secure emergency treatment for Sierra-Lopez.  Most critically, plaintiff once again fails to establish that Nurse Valerius had the authority to refer him to a hospital for further treatment, especially in light of Dr. Syed's ongoing treatment of Sierra-Lopez's medical needs.  *See Holloway*, 700 F.3d at 1075 (recognizing that nurses generally may rely on physician's instructions).  For these reasons, the court agrees that summary judgment in favor of Valerius is warranted.

### D. Dr. Salman Syed

With respect to his treatment while incarcerated at CCI, plaintiff claims that Dr. Syed was deliberately indifferent to his penile injury by failing to refer him to a urologist to address his ongoing complaints of pain and bleeding while urinating. The undisputed record reflects that on March 11, 2016, the day of plaintiff's self-harm injuries, Dr. Syed conducted an abdominal and penile examination, including using forceps to examine the inside of Sierra-Lopez's penis and obtained an ultrasound of his bladder, but did not locate any foreign body. In response to continued complaints of pain and urine in his blood, Dr. Syed further ordered x-rays on March 15, 2016, and an ultrasound and x-ray in August.

Dr. Syed further avers that "if any metal objects, such as a paperclip, were present in Sierra-Lopez's bladder or penile shaft, they would have been visible on the [March 15] x-ray." (Syed Decl. (dkt. #140) ¶ 15.) As noted above, however, there is no indication that the x-rays covered his penis; instead they appear to have been inexplicably limited to his kidney, bladder and ureter (the duct that runs from the kidney to the bladder). Indeed, the radiologist's written impression focuses on his bowels. Moreover, Syed explains that the purpose of the subsequent August scans were to "rule out a foreign body in bladder." (*Id.* ¶ 20.) Perhaps most compelling, in March 201_7_, a urologist located a piece of a paper clip in his urethra, further undermining Syed's belief that these scans would have detected a foreign body in his penis.

In a medical record note dated August 22, 2016, it appears that Dr. Syed eventually referred plaintiff to a urologist, but that referral came over five months after Sierra-Lopez reported inserting a paperclip into his penis. If Dr. Syed had conducted tests to rule out

24

Sierra-Lopez's self-report, this long delay might be more understandable, but the record reflects that he persisted with an ineffective course of exploration by focusing on Sierra-Lopez's bladder.  As the Seventh Circuit recently reiterated in *Goodloe v. Sood*, 947 F.3d 1026 (7th Cir. 2020), "faced with an inmate experiencing ongoing suffering from a serious medical condition, a prison physician cannot 'doggedly persis[t] in a course of treatment known to be ineffective' without violating the Eighth Amendment."  *Id.* at 1031 (quoting *Greenco v. Daley*, 414 F.3d 645, 654-55 (7th Cir. 2005)).  On this record, the court concludes that a reasonable jury could find Dr. Syed acted with deliberate indifference to Sierra-Lopez's medical needs.[15]

### E.  WSPF HSU Manager Jolinda Waterman

Next, plaintiff asserts claims against WSPF HSU Manager Jolinda Waterman based on:  (1) her delay in seeking care of the scar on his right arm; (2) her delay in securing treatment with a specialist to address his penile pain; and (3) her failure to adequately manage his pain, including inconsistent access to lidocaine and the denial of Gabapentin.

---

[15] The court is also troubled by CCI's failure to actually schedule an appointment with a urologist at UW Health, although this does not appear to have been within Dr. Syed's control.  Plaintiff was transferred to WSPF on October 21, 2016, two months after Dr. Syed's referral.  While HSU Manager Jolinda Waterman noted the urology referral in a December 2, 2016, note, some six weeks after his arrival at WSPF, there appears to be no concerted effort between the institutions to secure an appointment.  While none of the CCI defendants for which plaintiff was granted leave to proceed appear to be responsible for this delay in securing a urologist appointment after Dr. Syed's referral, the court notes that Sierra-Lopez also sought to name CCI HSU Manager Mary Mashak in his complaint, but was denied leave because his allegations were limited to her "failure to supervise and/or implement or enforce policies concerning medical treatment."  (3/12/19 Op. & Order (dkt. #28) 10.)  If Mashak was responsible for securing appointments with specialists, then perhaps she too should be named as a defendant.  In light of the court's decision to recruit pro bono counsel below, the court will allow plaintiff's counsel to explore this further and seek leave to amend his complaint if warranted.

*First*, starting with his complaint about arm pain, plaintiff specifically complains about the passage of time -- what he claims to be 10 months -- between his referral to a plastic surgeon and the surgery to remove the keloid scar on his arm.  The record reflects that on August 23, 2017, a WSPF physician Dr. Miller referred Sierra-Lopez to a "plastic surgeon for evaluation of forearm scar and keloid formation."  (Reid Decl., Ex. 2 (dkt. #150-2).)  Although the delay between this initial referral -- McArdle also referred him in November 2017 -- and his appointment with the plastic surgeon on March 23, 2018, was not 10 months, it was still an eight-month wait.

Moreover, Waterman did not submit a declaration in support of her motion for summary judgment, leaving the court with no basis to find that this delay either was outside of her control or otherwise reasonable.  Absent this evidence, the Seventh Circuit has advised that an "inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference," especially if "that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering."  *Goodloe*, 947 F.3d at 1031 (internal citations and quotation marks omitted).   While there may well be some explanation, defendant Waterman has failed to meet her burden at summary judgment of establishing that a reasonable jury could not find in plaintiff's favor on this aspect of his Eighth Amendment claim against Waterman.

*Second*, plaintiff claims that Waterman acted with deliberate indifference in failing to refer plaintiff to a urologist.  As described above, while incarcerated at CCI, plaintiff was referred to urology, but was not seen before his transfer to WSPF on October 21, 2016.  The record reflects that this referral was part of his transfer record to WSPF, which

26

Waterman noted in a December 2, 2016, note some six weeks after his transfer.  The record also reflects that Sierra-Lopez had an appointment with a urologist in February 2017, approximately four months after his transfer to WSPF, which defendants maintain was canceled by UW Health.  In contrast when Sierra-Lopez was eventually seen by a urologist in late March 2017, that doctor noted that Sierra-Lopez "has been scheduled several times for cystoscopy, but has not shown up," giving rise to a reasonable inference that defendant Waterman (or someone under her authority and control as HSU Manager) failed to secure timely an appointment with a urologist.  (Berg. Aff, Ex. B (dkt. #150-2) 5.)  Regardless of who was responsible for the canceled appointment or appointments, the undisputed record establishes that plaintiff waited nearly five additional months after his transfer to WSPF to see a urologist.  In the absence of any declaration by Jolinda Waterman explaining the reasons for this delay, the court concludes that a reasonable jury could also find against her on this aspect of his Eighth Amendment claim.

*Third*, plaintiff contends that Waterman violated his Eighth Amendment rights by failing to provide adequate pain management of both his arm and penile pain, specifically taking issue with the denial of Gabapentin and his inconsistent access to lidocaine.  As for the Gabapentin, the record reflects that a pain specialist, Dr. Peggy Kim, noted in a medical record dated July 20, 2018, that "[i]f his mental health improves in the future, other neuropathic pain medications could potentially be considered such as gabapentin, Lyrica, Cymbalta, or TCA.  However, at this time, I would refrain from starting these medications until he is more stable."  (Berg Decl., Ex. 1005 (dkt. #144-2) 149-54.)  As such, there was no order by a specialist for Gabapentin or some other neuropathic pain medication; rather,

Dr. Kim simply suggested it for future use.  Moreover, as detailed above, the record shows that Nurse Practitioner McArdle explored whether Gabapentin was recommended, both by seeking input from the WSPF psychiatrist and securing nerve testing of his arm to establish whether Gabapentin would be approved under the DOC's guidelines.  On this record, therefore, no reasonable jury could conclude that defendant Waterman acted with deliberate indifference in denying him Gabapentin.

As for the lidocaine, however, it appears that plaintiff was provided prescriptions for this medication but his medical record reflects interruptions in its provision.  Whether these interruptions would constitute an Eighth Amendment violation on its own is uncertain, but the facts supporting this aspect of his claim are arguably connected with defendant Waterman's failure to secure referral appointments.  Specifically, if defendant Waterman delayed in securing the appointments *and* securing regular pain prescriptions, this might bolster plaintiff's claim of deliberate indifference, on the other hand, were she taking adequate steps to ameliorate his pain or otherwise ensuring treatment of his medical needs, then any delay may be inconsequential.  Regardless, plaintiff's Eighth Amendment claim against Waterman may proceed to trial, and plaintiff may present all of his evidence in support of that claim.[16]

---

[16] Defendants also include a throw-away qualified immunity argument in their motion, with no analysis as to why the defense would be applicable to plaintiff's Eighth Amendment deliberate indifference claim.  Regardless, the law surrounding a state agent's requirements to provide medical care in the prison context is clearly established.  *See, e.g., Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) ("Based on our earlier discussion of the law governing deliberate indifference claims, we have no difficulty in concluding that the right to adequate medical care and treatment of conditions of inmates was clearly established at all times during the relevant actions in this case.").

### F. Nurse Practitioner Sandra McArdle

Plaintiff's claims against defendant McArdle are similar to those asserted against HSU Manager Waterman.  Specifically, Sierra-Lopez claims deliberate indifference based on:  (1) McArdle's delay in referring Sierra-Lopez to a specialist to treat the scar on his arm; and (2) her failure to adequately treat his penile pain.[17]  As for the first aspect of his claim, the undisputed record reflects that Nurse McArdle treated the scar on Sierra-Lopez's arm by providing prednisone injections, over the summer of 2017.  McArdle contends, and Sierra-Lopez does not dispute, that these injections resulted in a marked improvement of the keloid, although as she had warned, the injections did not completely resolve his issues with his scar.  Moreover, by November 2017, McArdle had referred plaintiff to a plastic surgeon.  On this record, therefore, the court agrees with defendant McArdle that a reasonable jury could not find her ongoing attempt to treat his scar and referral for surgery only a couple months after the last injection constitutes deliberate indifference.  *See Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) ("[A] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.") (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).  At most, the evidence simply supports a finding that plaintiff disagreed with McArdle's decision to attempt prednisone injections before referring him to a specialist,

---

[17] The court does not understand plaintiff to be complaining of defendant McArdle's failure to secure a urology referral and the record is clear that he had already been referred to a urologist by Dr. Syed.  Instead, plaintiff simply claims McArdle *knew* that he was upset because his February 2017 appointment had been canceled.  Moreover, once he was finally seen by a urologist in March 2017, the record reflects that plaintiff had appointments with a urologist approximately every six months until a urologist opined that there was no evidence of "any ongoing urological issues."  (Reid Decl., Ex. B (dkt. #150-2) 68.)

which does not form the basis for an Eighth Amendment violation.  *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition.") (internal citation and quotation marks omitted).

As for the second aspect of his claim -- McArdle's alleged failure to provide adequate pain medication -- any lapse in delivery of lidocaine would not be her responsibility, or at least plaintiff has failed to put forth evidence that would support a reasonable jury finding in her favor.  To the contrary, the record reflects that there were prescriptions for lidocaine beginning in July 2017.  As for Sierra-Lopez's complaints about a lack of Gabapentin, the court grants McArdle's motion for summary judgment for the same reasons described above in reference to defendant Waterman.  Accordingly, the court will grant defendant McArdle's motion for summary judgment.

## G. Health Services Nursing Coordinator for the DOC's Bureau of Health Services Lori Alsum

Finally, plaintiff would also pursue an Eighth Amendment claim against the Health Services Nursing Coordinator for the DOC's Bureau of Health Services, defendant Lori Alsum.  As described above, her role in this lawsuit is limited to review of Sierra-Lopez's December 5, 2018, inmate grievance in which he complained about being denied Gabapentin.  The WSPF Inmate Complaint Examiner initially rejected plaintiff's complaint as untimely, and Alsum was the reviewing authority assigned to that complaint.  While the complaint was again rejected as untimely, Alsum also provided a substantive

review of the complaint and found plaintiff's advanced care provider had reviewed the offsite provider's recommendations and responded to Sierra-Lopez's request regarding Gabapentin.   More specifically, Alsum's review of the medical record, included:  (1) Dr. Kim's suggestion that a neuropathic pain medication may be appropriate at some point in the future; and (2) McArdle's consideration of that suggestion and response to Sierra-Lopez.   On this record, plaintiff has simply failed to show that any of defendant Alsum's actions constitute deliberate indifference, or at least plaintiff has failed to put forth sufficient evidence from which a reasonable jury could so find.  Accordingly, the court will grant defendants' motion with respect to plaintiff's claim against Alsum as well.

## II. Renewed Motion for Assistance in Recruiting Counsel

In addition to defendants' motion for summary judgment, plaintiff has also renewed his motion for assistance in recruiting counsel.  (Dkt. #178.)  The court previously denied plaintiff's request for assistance in recruiting counsel, noting that plaintiff appeared capable of responding to defendants' motions for summary judgment.  (2/28/20 Order (dkt. #152) 9.)  At that time, however, the court indicated that plaintiff was free to renew his motion if his case survived summary judgment.  While plaintiff filed his renewed motion before the court issued its summary judgment decision, now that this case will proceed to trial on plaintiff's Eighth Amendment claims against defendants Syed and Waterman, and the fact that plaintiff has received significant assistance in prosecuting his claims from a "jailhouse attorney" who obviously will not be available to assist him at trial, the court agrees that the complexities of this case, and, in particular, the difficulties associated with trying a case, exceed Sierra-Lopez's abilities, particularly given his significant mental health issues

(Sierra-Lopez Aff. (dkt. #179).  Accordingly, the court will now seek to recruit counsel.

Sierra-Lopez should be aware that it may take several months before the court is able to secure pro bono representation, so all pre-trial deadlines and the trial date will be struck.   Plaintiff should continue to notify the court of any changes in address, as he has diligently done to date.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #137) is GRANTED IN PART AND DENIED IN PART.  The motion is GRANTED as to plaintiff's deliberate indifference claims against defendants Michael Lamarca, Jasen Miller, Denise Valerius and Lori Alsum.  At the close of this case, the clerk's office is directed to enter judgment in these defendants' favor.  The court declines to exercise its supplemental jurisdiction over plaintiff's state-law medical malpractice claim against Lamarca, and will dismiss that claim without prejudice.  The motion is DENIED as to plaintiff's claims against defendants Salam Syed and Jolinda Waterman.

2) Defendant Sandra McArdle's motion for summary judgment (dkt. #146) is also GRANTED.  At the close of this case, the clerk's office is directed to enter judgment in defendant McArdle's favor as well.

3) Plaintiff's claims against defendant Barb or Barbara Harris a/k/a Nurse are DISMISSED WITHOUT PREJUDICE, and the clerk's office is directed to terminate her as a party.

4) Defendant Rebecca Tracy's deadline for filing a dispositive motion deadline is August 3, 2020.

5) Plaintiff's renewed motion for assistance in recruiting counsel (dkt. #178) is GRANTED.

6) Defendant Sandra McArdle's motion to stay (dkt. #182) and defendant Rebecca Tracy's motion to joint McArdle's motion to stay (dkt. #184) are both DENIED AS MOOT.

7)  All pretrial deadlines and the trial date are STRUCK.

Entered this 1st day of July, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge